Agnes, A.J.
Introduction
The plaintiff Alvin Kibbe, Jr. filed a civil action against the defendant Zoning Board of Appeals of the Town of Douglas under G.L.c. 40A, §17 to challenge an adverse decision by the Board upholding the Building Commissioner’s denial of a building permit and a request for a variance to construct a single-family dwelling on a non-conforming lot. The Board found that the plaintiff had previously obtained a building permit within 3 years after removing a trailer from the lot, but thereafter did not act upon it. The Board ruled that the grandfathering for the lot had expired. The defendant has filed a motion for summary judgment in which it maintains that this court has no jurisdiction to proceed because the plaintiff did not notify the Clerk in a timely manner as required by G.L.c. 40A, §17.
Background
The essential facts are not in dispute. The written decision by the Board was filed with the Clerk of the Town of Douglas on May 7, 2003. Exhibit A to the Defendant’s Motion for Summary Judgment (“Defendant’s Motion”). Within 20 days of the Board’s decision the plaintiff filed a complaint against the Board in the Worcester Superior Court setting forth a challenge to the Board’s decision. Exhibit C to the Defendant’s Motion. A copy of that complaint and a summons was served on the Clerk of the Town of Douglas on May 29, 2003. That was the first notice to the Clerk of the plaintiffs decision to appeal. See Exhibit B to the Defendant’s Motion (Affidavit of Christine Furno, Clerk of the Town of Douglas).[1]
Discussion
1. The Clerk of a City or Town Must Be Given Notice of an Action under G.L.c. 40A, §17 Within Twenty Days
G.L.c. 40A, §17 provides in part that “(a]ny person aggrieved by .a decision of the board of appeals or any special permit granting authority . . . whether or not previously a party to the proceeding . . . may appeal ... by bringing an action within twenty days after the decision has been filed in the office of the city or town clerk . . . Notice of the action with a copy of the complaint shall be given to such city or town clerk so as to be received within such twenty days.” G.L.c. 40A, §17. “The purpose of the notice provision is to give interested third persons at least constructive notice of the appeal.” Costello v. Board of Appeals of Lexington, 3 Mass.App.Ct. 441, 443 (1975). The statute requires an aggrieved party to do two things to perfect an appealfile an action in court and give notice of the action to the city or town clerk. Although the aggrieved *161 party is not required to cross eveiy “t” and dot every “i,” see McLaughlin v. Rockland Zoning Bd. of Appeals, 351 Mass. 678, 679-80 (1967) (the notice requirement is satisfied where the clerk only received a notice of the action but not a copy of the complaint); Grief v. Baker, 16 Mass. L. Rptr. 90 (Mass. Superior 2003) (The Town Clerk’s Office was timely served with the complaint. There is no statutory requirement that the complaint be accompanied by something entitled, “notice of appeal”), there is no exception to the requirement that the appealing party must demonstrate that the clerk had actual knowledge of the appeal within 20 days. See Konover Management Corp. v. Planning Board of Auburn, 32 Mass.App.Ct. 319 (1992).
2.
In Bingham v. City Council of Fitchburg, 52 Mass.App.Ct. 566 (2001), the Appeals Court held that an abutter appealing the granting of a special permit by the Fitchburg City Council failed to comply with G.L.c. 40A, §17 even though he filed his complaint in the Land Court on the final day of the twenty-day period because the papers did not reach the office of the city clerk until 15 minutes after it closed. Bingham, supra at 567. Even though the papers were date-stamped 4:45 p.m. by the mayor, who opened the door for the paralegal who was delivering the papers for the plaintiffs attorney, the clerk did not become aware of the notice of appeal until the morning of the next day. Id. The Appeals Court upheld the trial judge’s decision to dismiss the claims based on the statute’s requirement of notice to the clerk within 20 days. “The twenty-first day is not the twentieth day.” Id, at 571. This court reached the same result in Sanderson v. Zoning Board of Spencer, 2001 WL 1763446, 14 Mass. L. Rptr. 81 (Worcester Superior. 2001) (Locke, J.), a case in which the appeal was filed in the Superior Court within 20 days, but notice of the plaintiffs’ appeal did not reach the clerk’s office in Spencer until the morning of day twenty-one. Accord, Jacobs v. Town of Weston, 14 Mass. L. Rptr. 211 (Mass. Superior 2001), affirmed 58 Mass.App.Ct. 1111 2003) (appealing party served the clerk of the Board, not the town clerk, and there is no evidence that the town clerk became aware that plaintiff had filed an action within 20 days); Solomon Pond Realty Trust v. Zoning Board of Appeals, Northborough, 1999 WL 791901 (Worcester Superior. 1999) (Josephson, J.).
3. Problems Associated with Self-representation
This case illustrates one of the perils that a person faces when judicial review is sought of the decision of an administrative agency or board at the local or state level without the advice and representation of an attorney. The law in this area is complex, and the court is required to apply some of the rules strictly in order to protect the interests of persons who may be affected by the board or agency’s decision such as persons who are abutters to the property owned by the plaintiff in this case. Many of these rules and requirements, like the 20-daynotice provision contained in G.L.c. 40A, §17 and involved in this case, may be unfamiliar to a non-lawyer, or may not seem to be significant to a lay person.
In this court’s experience, persons who choose to represent themselves in proceedings before the Superior Court are treated with patience and understanding by the court officers, clerical staff, and the clerks. Special efforts are made in such cases to explain to pro se litigants as much of the procedural and substantive law and the rules that apply in their case as can be done consistent with the obligation of court personnel to be fair and impartial to all parties, and their duly to give appropriate time and attention to the parties and witnesses in other cases. Judges too, in this court’s experience, make an effort to be better listeners and to explain in even more detail than ordinarily is the case the applicable law and the court’s reasoning in cases involving pro se litigants.[2] But when it comes to the decision that a court must make on a motion, whether it is procedural or relating to the merits, judges are not permitted to disregard the requirements of the law because one or more of the parties is not represented by an attorney. See generally Farretta v. California, 422 U.S. 806, 834 n.46 (1975); Jackson v. Commonwealth, 430 Mass. 260, 264 (1999), cert. denied, 528 U.S. 1194 (2000); Solimine v. Davidian, 422 Mass. 1002 (1996); Maza v. Commonwealth, 423 Mass. 1006, 1006 (1996); Brossard v. West Roxbury Div. of the Dist Court Dep’t, 417 Mass. 183, 184 (1994); Mmoe v. Commonwealth, 393 Mass. 617, 620 (1985).
It is critical that we recognize, however, that while the problems associated with pro se representation in civil cases result in some instances from an ill-advised judgment made by a party not to pay the costs of legal representation, in many cases a party has no choice because he or she is unable to pay the cost of legal representation. In this regard, the recent observations made by Dennis Archer, President of the American Bar Association, about the huge volume of unmet legal needs of poor people in America deserve attention, and for that reason they are set forth in the Appendix to this decision.
4. Order
For the above reasons, the defendants’ motion for Summary Judgment is ALLOWED.
REMARKS BY DENNIS ARCHER, ESQ., PRESIDENT OF THE AMERICAN BAR ASSOCIATION
Excerpted from “Access to Justice: Does it Exist in Civil Cases,” 17 Geo.J. Legal Ethics 455, 457-63 (2004)
One of our greatest challenges in our professional ethics as in our personal lives is to live up to our promises. We’ve not done so with respect to our public service obligations, either collectively or individually. Seventy to eighty percent of the legal needs of poor people in this nation go unaddressed. An American Bar Association nationwide legal study in 1993 showed that legal help was not obtained for over *162 seventy percent of the serious legal problems encountered by poor people. Ten years have passed since the American Bar research and of course matters have gotten worse. A September 2003 report by the District of Columbia Bar Foundation estimates that ten percent of the need for civil legal assistance is being met. A similar study in the other Washington, that is the state of Washington, also released in September 2003, found that eighty-seven percent of the state’s low income households encountered a civil legal problem each year, and that only twelve percent of those households were able to obtain assistance from a lawyer.
Things are only a little better in Massachusetts, which is a state with significant legal services resources. That state studied the legal needs of its poor citizens in 1993 and again in 2002. They found that the occurrence of civil legal problems among [the] poor increased significantly over that period. By 2002 at least fifty-three percent of the poor households in the state had at least one civil unmet need. Only thirteen percent of the households experiencing legal problems resolved all those problems. Similar studies were conducted over the last three or four years in six more states and we would hardly be surprised that each produced similarly dismal statistics. The 2000 census found nearly a six percent increase in poverty in the United States with over 35 million people living below the poverty threshold. The number of people in need is increasing while the resources to provide help are shrinking. The sad fact is that our society fails to care adequately for poor people in trouble. We can reach the moon and the planets. We can free the oppressed from around the globe, but we do not seem to be able to meet the legal needs of our own neighbors right here at home.
And it is a sad irony that I appear before you at this time because last month on January 8, back in 1964, President Lyndon Johnson declared that the United States would wage a war. His was not a war in a foreign land but a war at home, a war on poverty. His Attorney General, Robert Kennedy, said in a Law Day speech that year that helplessness does not stem from the absence of theoretical rights. It can stem from an inability to assert real rights. The tenants of slums and public housing projects, the purchaser from disreputable finance companies, the minority group member who is discriminated against, all these may have legal rights which, if we are candid, remain in the limbo of the law. But we have not yet triumphed over poverty nor have we even made significant strides to reduce it to better serve the legal needs of those who it drags down. The poverty rate today is little changed from the 1960s and most of the legal needs of the poor go unaddressed. We all share culpability in this regard, the executive, the legislative and judicial branches of government and the organized bar. The principal national funding source for our legal services aid programs is the Federal Legal Services Corporation which Father Drinan alluded to earliera program created no less by President Nixon in 1974. This program has never been given adequate resources to do its job. It reached its highest but most inadequate funding level in 1994 with a $415 million appropriation. But opponents whittled that down and now the Legal Services Corporation only receives, as Father Drinan mentioned, $338 million. If its appropriation had not increased at all but merely kept up with inflation it would now be receiving $490 million. So we can see how far we have fallen behind.
President Bush has been supportive of the Legal Services Corporation and we are grateful for that. But on the whole and over the years our political leaders have not found away to put aside their differences and provide adequate resources to respond to the desperate need of the poor for legal help. We must all join together to seek adequate appropriation for the Legal Services Corporation. Our courts have recognized that the indigent must be provided a lawyer before they may be imprisoned by bars of steel. But they have not yet grasped that a lawyer is often necessary to avoid the shackles of poverty or discrimination. This past year we saw the Fortieth anniversary of the famed Gideon v. Wainwright case that created a right to counsel for those facing incarceration. But we do not provide such services for poor people with civil legal problems, problems that can bind them into poverty and prevent them from becoming productive members of society. Thiey have been courageous individuals who have asserted such a right. Last year, just up the road in Maryland, a single mother named Doris Frays was compelled to go to court to defend the custody of her children against unrelated third parties who were represented by counsel. She could not afford counsel and repeatedly requested the court to appoint counsel to assist her. Her pleas were ignored or denied. On appeal she asked the court of appeals to consider whether she had a right to counsel under the Maryland constitution.
The state’s highest court, the Court of Appeals by a narrow 4-4 margin decided not to decide this important question. But Judge Cattrell wrote an eloquent concurring opinion joined by Chief Judge Bell and Judge Eldridge saying, “this issue will not go away.” The poor need a yes or no. The three concurring judges would not only have addressed the issue but would have resolved it by “holdings in cases involving the fundamental right of parents to parent their children. Especially when the parent is a defendant and not a plaintiff, counsel should be provided for those parents who lack independent means to retain private counsel.” I’m hopeful that these justices will be proven correct. That the poor’s day will come. Perhaps it will sooner rather than later. A case now pending in the state of Washington is raising similar issues.
Our law in jurisprudence lags far behind that of other western nations in this regard. The constitutions of the Netherlands, Italy; [and] South Africa explicitly recognize a right to counsel for the indigent in civil cases when substantial injustice would otherwise result. In *163 addition, beginning in the late 1800s, most other western nations recognize some form of right to counsel in civil cases through legislation or court decisions. Further, when you compare our expenditure of public resources to address the legal needs of the poor here in the United States with systems in place in other western industrialized nations we come up sorely lacking. California Appeals Court Justice Earl Johnson has conducted extensive studies of legal aid systems internationally. He concludes that the least generous, least generous of other industrial democracies, France and Germany, invest 2.5 times as much of their GNP as the United States in serving the civil legal needs of lower income populations. England, on the other hand, spends 17 times as much to provide access to justice for its poorer people. According to Justice Johnson if we were to match the French/German approach we would be spending about $1.6 billion on legal services. Or, if we were to follow the lead of Tony Blair’s government we would be spending about $10 billion on legal services, not the $338 million that we are currently appropriating but $10 billion if we followed the U.K.
So far I’ve talked about what the government has done or failed to do to address this problem. But as lawyers we cannot stand by and expect the government to solve the riddle by itself. Remember, we have pledged as a profession and as individual lawyers to abide by a code of ethics that requires a commitment to public service and to pro bono work. We serve the poor and defenseless against those who would exploit or even destroy them, whether that work is free of charge or for a minimal fee. We take an oath to work on behalf of those who cannot afford our services. Perhaps only the members of the clergy, Father Drinan, make a similar professional pledge to do pro bono work. Lawyers have power, power to challenge injustice, to change society, to help those in need, to make lasting contributions to the betterment of our communities and our world. And I believe that lawyers have the power to heal. Lawyers are in many respects healers, like physicians and the clergy. We take an oath that includes faithfully representing clients, maintaining their confidences and preserving as inviolate their communications. Undertaking representation of the oppressed, the defenseless and disempowered with a just cause without regard for considerations personal to ourselves and of course all of us uphold the law.
Indeed lawyers do have a power to heal the wounds of injustice, to right wrongs and to ensure that they never happen again. Lawyers often help people when they are at their most vulnerable, most troubled, or in crisis. It is in those times of pain and need that clients need us the most. We can be counselors, advisors, problem-solvers, and even peacemakers. As stated in our oath, among our many tasks is our obligation to serve the poor and the defenseless, to defend them against those who would exploit or even destroy them, whether to do it free or for minimal fee. I believe that lawyering is a calling, a calling to serve the public, and I don’t hesitate to use the word calling in a religious sense. I firmly believe that lawyers are ministers of justice.On an individual level, if we approach our life’s work as healers, if we reorient our thinking to take advantage of the power of healing, we can do much good for our clients and others. The mere presence of a lawyer can bring comfort and solace to a person in need of help. Knowing that we can positively affect change in a way that may be difficult or an adversarial situation, lawyers as healers can promote a model that emphasizes the greater good. Lawyer-by-training Mohandas Gandhi suggested that the true function of lawyer was to unite parties driven asunder. His healing power was such that he was able to peacefully overcome the might of a well armed British militia and lead his country towards independence. Lawyer Franklin Roosevelt healed a nation by bringing faith and hope at a time when we needed it the most. His New Deal put the unemployed back to work, boosted business and agriculture to get Wall Street back on its feet, and developed a social safely net of assistance to those who needed it. He made tough choices politically but he knew that the greater good would be served by taking care of people. Lawyer Thurgood Marshall, one of my great inspirations, helped heal a nation suffering from a legacy of slavery and racial bias. He attacked policies and procedures that were wrong and unfair. He won twenty-nine out of the thirty-two cases that he argued before the United States Supreme Court. His goal was to open doors and he used his power as lawyer to do that, to remedy injustice in a way that extended opportunities for generations to come. Marshall was a healer of pain in our society. So you see lawyers heal in many ways. And many of you will do that every day. You will stand up to represent those accused of the worst crimes and those who may be sentenced to death and may be on appeal. You will give notice to those who have no resources, who are too young, too ill, too poor to defend themselves. You will help families, business partners and corporations resolve their differences and you will find solutions to their problems. You will defend rights of even those who are most reviled in our society. And you will do so sometimes against your own self-interest. But in doing so you will heal the community and you will bring justice and resolution to issues that seem so incredibly unjust and so irresolute. You will heal by bringing the power of your words, your knowledge, your compassion to bear on the cases you work to resolve.
You know while many would denigrate our profession, without lawyers providing time and expertise, most often free of charge, much good, much healing in this world would never be accomplished. We are the ultimate volunteers in public service in our society. There is not a chamber of commerce, a battered women’s shelter, a symphony orchestra, a boys and girls club, a church, a synagogue, a mosque, a nonprofit board in this countiy that does not have lawyers *164 from the community intimately involved. I want to encourage every person who is here and those who would be watching, if you are a lawyer get involved in a public service initiative that helps support and increases equity and justice wherever you may live. It will not only enrich your legal experience but offer you a sense of fulfillment and greater purpose.
And I think one of the best ways to get involved, of course (Father Drinan, you know I’ve got to put this out there), is to join the American Bar Association. We have a great role in speaking out on behalf of lawyers nationwide and internationally and in promoting the rule of law wherever possible. Our legal profession has last year one million fifty thousand licensed lawyers. Of that number, 750,000 of us practice law. The overwhelming number of us who practice law are sole practitioners, outstanding men and women who every day of their lives do a wonderful job on behalf of their clients. They have a secretary, and they may have a para-legal and if they are fortunate enough to practice in the Washington, D.C. area, they might even be lucky enough to have a law clerk from Georgetown. The overwhelming number of lawyers who practice in law firms practice in law firms the size of two to ten. And those of us who practice law in law firms of fitly or more represent about that much of the practicing bar. We have law firms like mine that have pro bono coordinators and we all participate either by taking cases or since I’m traveling around the United States a lot, and doing a little international travel on behalf of the American bar, I write a check to the Access to Justice Fund in Michigan so that our bar association can make sure that as many people as possible can be covered by lawyers who are doing such a fine j ob in the legal services practice of law. Despite the law firms who do pro bono work and despite the fact that the Legal Services Corporation through their entities do such a fine job in representing people as I mentioned at the outset, we have too many of our citizens who are not being served, and that there are tremendous unmet legal needs.
You heard me observe the fact that our professional rules of conduct ask us to do fifty hours of pro bono service each year. Perhaps we’re going to have to take another look in terms of how best that is done. I’ve questioned and I’m not sure if we’ve ever done it before, but perhaps Esther Lardent and the panel that follows my discussion can answer the question. To be licensed as a lawyer is a privilege; it is not a right. Nobody promises anyone that if you enter a great law school like Georgetown that you are going to graduate. Nobody promises anyone that if you graduate from law school that you are going to pass the bar, and nobody promises you that if you graduate from law school and pass the bar that you are going to of course be the wealthiest lawyer in the world. But it is a privilege, and with that privilege to be a licensed lawyer (whether we practice or not), I would be curious to know how many who are licensed, but do not practice law, engage in pro bono work. And perhaps that is something we ought to take a look at in going back to the privilege of practicing law.
I close out my formal remarks by just reminding all of us that thanks to the hard work of volunteers who do pro bono work, whether in law firms, as sole practitioners, in the law firms of two to ten or in the large law firms, we still do not have enough lawyers to help those who live below the poverty line. I want you to think about that. I don’t want it to happen but regrettably it seems to: We may leave for lunch or on our way home, turn on the radios in our cars or when we arrive at home or we might even if you have time (I don’t know how you do at law school) but if you have time to glimpse at television and all of a sudden because of technology there is a zeroing in on a location somewhere in the United States. We learn as we watch the sceneyou see a lot of police cars and we’re wondering in our mind before the commentator speaks what is going on, what is this scene. And how many times have we seen or heard a commentator say someone went into their former place of employment, where they had been terminated, laid off, etc., or they’ve gone into the place that they dealt with in terms of paying their rent, etc. and they are being evicted or they went to the mortgage company and you know what I’m talking aboutsomebody has gone in with a gun and has generally killed one, two or three people and most often as we’ve learned they’ve killed themselves. I would say to you that we would see more of that on television if we did not have lawyers providing pro bono workpeople, who, with respect, listen to the concerns of those who have no hope, and who feel that nobody is paying any attention to them and in rage they go in and they do something. But if they had seen a lawyer, if they had an opportunity to have their unmet legal needs addressed, even though they may not win, at least they know that someone cared, listened to them, explained to them their rights that would allow them to better process it and understand. The lawyers who do pro bono work, the lawyers who take less money, earn less money to practice in legal services do this great country and our profession a great service. And that is why I’m proud to be a lawyer. Thank you.

In addition to the motion for summary judgment filed by the defendant, the court has considered the plaintiffs paper dated May 23, 2003 and captioned “answer.” The plaintiff has not otherwise filed any opposition.

It is important to recognize, as one commentator has observed, that the duty to remain impartial should not lead judges to refrain from steps to make the judicial process more comprehensible and more meaningful to pro se litigants. “[OJur focus on the appearance of judicial neutrality has caused us improperly to equate judicial engagement with judicial non-neutrality, and therefore, to resist the forms of judicial engagement that are in fact required to guarantee true neutrality ... In the pro se context, the appearance of neutrality and true neutrality are often very different, and true neutrality often requires a form of engagement that may seem inconsistent with traditional expectations for the appearance of neutrality.” R. Zorza, “The Disconnect Between the Requirements of Judicial Neutrality and Those of Appearance of Neutrality When Parties Appear Pro Se: Causes, Solutions, Recommendations and Implications,’’ 17 Geo.J.Legal Ethics 423, 424. (2004).